**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

LEONARD RIVERA,

      Plaintiff,

v.                                  CV 13-0698 WPL

COMMISSIONER,
SOCIAL SECURITY ADMINISTRATION,

      Defendant.

**MEMORANDUM OPINION AND ORDER**

Leonard Rivera filed applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") payments on December 4, 2009. (Administrative Record ("AR") 18, 153, 160.) He alleged that he had been disabled from May 29, 2009, due to bulging and ruptured vertebrae, disc degeneration, and depression. (AR 196.) Administrative Law Judge ("ALJ") Michelle K. Lindsay held a hearing on his applications on October 4, 2011. (AR 18.) She determined that Rivera was not under a disability as defined by the Social Security Act and therefore not entitled to benefits. (AR 27-28.) Both applications were denied. (*Id.*) Rivera requested review by the Appeals Council, but that request was denied, making the ALJ's decision the final decision of the Social Security Administration ("SSA"). (AR 1-3.)

Rivera sought a review of the SSA's decision (Doc. 1) and filed a motion to reverse and remand for rehearing (Doc. 20; *see also* Doc. 21 (memorandum)). The Acting Commissioner of the SSA ("Commissioner") responded (Doc. 24), and Rivera filed a reply (Doc. 25). Having read and carefully considered the entire record and the relevant law, I grant Rivera's motion and remand this case to the SSA for proceedings consistent with this opinion.

### STANDARD OF REVIEW

In reviewing the ALJ's decision, I must determine whether it is supported by substantial evidence in the record and whether the correct legal standards were applied. *See Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (citation omitted). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009) (quoting *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007)). A decision is not based on substantial evidence if other evidence in the record overwhelms it or if there is only a scintilla of evidence supporting it. *Hamlin*, 365 F.3d at 1214 (quotation omitted). However, substantial evidence does not require a preponderance of evidence. *U.S. Cellular Tel. of Greater Tulsa, L.L.C. v. City of Broken Arrow, Okla.*, 340 F.3d 1122, 1133 (10th Cir. 2003). I must meticulously examine the record, but I may neither reweigh the evidence nor substitute my discretion for that of the Commissioner. *See Hamlin*, 365 F.3d at 1214 (quotation omitted). I may reverse and remand if the ALJ has failed "to apply the correct legal standards, or to show us that []he has done so." *Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996).

### SEQUENTIAL EVALUATION PROCESS

The SSA has devised a five-step sequential evaluation process to determine disability. *See Barnhart v. Thomas*, 540 U.S. 20, 24 (2003); *Wall*, 561 F.3d at 1051-52; 20 C.F.R. §§ 404.1520, 416.920 (2013). If a finding of disability or nondisability is directed at any point, the SSA will not proceed through the remaining steps. *Thomas*, 540 U.S. at 24. At the first three steps, the ALJ considers the claimant's current work activity and the severity of his impairment or combination of impairments. *See id.* at 24-25. If no finding is directed after the third step, the Commissioner must determine the claimant's residual functional capacity ("RFC"), or the most

that he is able to do despite his limitations. *See* 20 C.F.R. §§ 404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1). At step four, the claimant must prove that, based on his RFC, he is unable to perform the work he has done in the past. *See Thomas*, 540 U.S. at 25. At the final step, the burden shifts to the Commissioner to determine whether, considering the claimant's vocational factors, he is capable of performing other jobs existing in significant numbers in the national economy. *See id.*; *see also Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988) (discussing the five-step sequential evaluation process in detail).

### FACTUAL BACKGROUND

Rivera, age forty-six, is a high school graduate who worked as an elementary school substitute teacher for three and a half years, through mid-2009. (AR 197, 202, 244.) Prior to that, Rivera worked primarily in restaurant and retail settings, with jobs ranging from cashier and department manager to waiter and bar manager. (AR 197.) His potential disability onset date was May 29, 2009, which was also the end of his last period of employment. (AR 196.)

In August 2007, Rivera underwent a single physical examination by Claude D. Gelinas, M.D., whom he told that he injured his back in a workplace accident in July 2002. (AR 252; *see also* AR 53.) Although Rivera reported that he only felt a "twinge" at the time of the injury, the pain grew worse, eventually leading to constant back pain and some intermittent numbness and tingling in his right leg. (AR 252.) Dr. Gelinas observed that Rivera's range of motion with respect to his back was about thirty degrees of flexion and ten degrees of extension, with "some minimal tenderness and spasms." (*Id.*) He also noted a near-normal gait, negative straight leg raise, normal sensory exam, no focal motor weakness, and no atrophy or edema. (*Id.*) After

reviewing a July 2007 MRI,[1] Dr. Gelinas diagnosed Rivera with severe degenerative disc disease and right-sided disc herniation at L4-5 and L5-S1. (AR 252-53.) Dr. Gelinas opined that Rivera's symptoms were not severe enough to justify a fusion procedure, but he did refer Rivera to pain management and indicated a plan to get Rivera a trial of an interferential muscle stimulator unit. (AR 253.) Dr. Gelinas concluded that Rivera would be permanently restricted to work in a light duty capacity. (*Id.*)

Rivera underwent a right L4-5 facet injection on June 1, 2009. (AR 260.) At a visit several weeks later with Carlos J. Esparza, M.D., Rivera reported eighty percent relief from the injection with no radiculopathy noted, and he reported that sensation was returning to his right leg. (*Id.*) Still, he continued to suffer from constant low-grade back pain, which worsened with prolonged sitting, standing, or lying down. (*Id.*) Rivera reported taking 7.5 mg of Lortab three times a day. (*Id.*) On examination, Dr. Esparza observed mild tenderness over the iliolumbar area, no significant spasms, normal ambulation, and negative straight leg raising bilaterally, with diminished strength in the right quadriceps and decreased sensation over the L4 dermatome. (*Id.*) Dr. Esparza diagnosed Rivera with lumbar spondylosis but noted "[e]xcellent relief with facet injections." (*Id.*) He prescribed Flector patches for nighttime relief and stated that Rivera would continue to do stretching exercises. (*Id.*)

At a follow-up visit with Dr. Esparza in November 2009, Rivera reported that the June facet joint injection had not provided long-term relief and that the Lortab, Flector patches, and stretching exercises were not adequately controlling the pain. (AR 258.) Dr. Esparza observed spasms and tenderness in the iliolumborum and quadratus lumborum, "[m]ildly positive" straight leg raise on the right, "some" sensory disturbance over the L4 dermatome, slightly diminished

---

[1] Rivera did not provide records of this MRI to the SSA.

strength in the right quadriceps, and ambulation with an antalgic gait. (*Id.*) He diagnosed Rivera with chronic back pain with a history of lumbar spondylosis and encouraged the continued use of Flector patches and the use of a cane to address balance and ambulation problems. (*Id.*) He also scheduled Rivera for a repeat lumbar facet injection and refilled the hydrocodone prescription at a higher dose. (*Id.*)

Rivera applied for DIB and SSI payments on December 4, 2009. (AR 18.) In the disability report he completed shortly thereafter, Rivera cited "[b]ulging and ruptured discs in back, disc degeneration, [and] depression" as conditions limiting his ability to work. (AR 196.) He stated that he cannot sit or stand for longer than fifteen to twenty minutes or carry more than five pounds, that he needs a cane due to pain and a limp on his right side, and that he is unable to drive, work, or get enough sleep due to the constant use of pain medication. (*Id.*) He also said that his pain and lack of sleep leave him unable to concentrate and that he is always moody, unhappy, and aggravated. (*Id.*) He further claimed that his depression, medication, and lack of sleep lead to decreased appetite and weight loss. (*Id.*) In a function report completed shortly after Rivera applied for DIB and SSI payments, Rivera's wife said that he helps with meals when he can and is able to dust, do laundry, and vacuum with the help of his children. (AR 206.) She also noted that he is able to drive or ride in a car and that he goes shopping for food and necessities on a weekly basis. (AR 207.) His wife also wrote that Rivera can follow written or verbal instructions well when not medicated. (AR 209.) These statements are largely consistent with those in Rivera's own function report. (*See* AR 212-19.)

On January 22, 2010, non-examining agency consultative physician Mark A. Werner, M.D., completed a physical RFC assessment of Rivera. (AR 267-74.) Dr. Werner's RFC considered Rivera's disability report and his wife's function report, records from Dr. Gelinas,

and records from Dr. Esparza. (AR 268-69.) Based on the information available, Dr. Werner determined that Rivera could occasionally lift twenty pounds, frequently lift or carry ten pounds, push or pull an amount commensurate with his lifting and carrying limitations, stand or walk for at least two hours in an eight-hour workday, and sit for about six hours in a workday. (AR 268.) With respect to postural limitations, Dr. Werner stated that Rivera was never able to balance but could occasionally perform all other tasks. (AR 269.) He also opined that Rivera should avoid concentrated exposure to extreme cold, vibration, and environmental hazards but that he otherwise had no environmental limitations. (AR 271.) Dr. Werner did not recommend any manipulative, visual, or communicative limitations. (AR 270-71.) Regarding Rivera's symptoms, Dr. Werner found that Rivera was mostly credible but that some of his alleged limitations appeared to be excessive and were contrary to the medical evidence and his function report. (AR 272.) In other words, while Rivera's symptoms were attributable to a medically determinable impairment, the severity and duration of the symptoms were disproportionate to that expected. (*Id.*)

Next, non-examining agency consultant Elizabeth Chiang, M.D., completed a psychiatric review technique on January 25, 2010. (AR 275-88.) Relying on the available records, Dr. Chiang observed that although Rivera alleged depression, he had not sought treatment for depression and was not taking any medication for depression. (AR 287.) She also noted that Rivera was social and able to follow directions and that the field office teleclaim found no problems with concentration or understanding. (*Id.*) Accordingly, Dr. Chiang concluded that Rivera did not suffer from a medically determinable psychiatric impairment (AR 275), and she did not assess any functional limitations associated with paragraphs B or C of various psychiatric

listings (AR 285-86). That same day, SSA reached an initial determination of nondisability. (AR 76-77.)

Rivera continued to seek treatment from Dr. Esparza for several more months. Rivera received a posterior lumbar facet joint injection at the right L4-5 and L5-S1 levels (AR 293-94), and while he later reported relief, he also stated that his lower back was still hurting in a different way and that he had little sensation in his right leg (AR 291). Dr. Esparza noted some iliolumborum spasms on the left, gluteus muscle spasms, "somewhat diminished" motor strength, an antalgic gait, and sensory disturbances over the right L4 dermatome. (*Id.*) Dr. Esparza added myofascial pain syndrome to his diagnosis and recommended Robaxin 750 mg, continued hydrocodone, and stretching exercises. (*Id.*) At another follow-up examination with Dr. Esparza on April 21, 2010, Rivera reported "some slight relief" from the injections, but he claimed that his back and right leg pain remained and were becoming progressively worse. (AR 289.) There was no focal motor weakness, and straight leg raising was negative bilaterally. (*Id.*) Still, Dr. Esparza stated that Rivera had "some difficulty" moving from sitting to a standing position and observed "some slight loss of sensation in the L4-5 dermatomal region on the right leg." (*Id.*) He also noted spasms throughout the lumbar region on the paraspinals at the lower levels and some spasms in the gluteal muscles. (*Id.*)

Given Rivera's history and his complaints of progressively worsening symptoms, Dr. Esparza ordered an MRI to see if any changes had occurred since the previous MRI. (AR 289-90.) The MRI, completed on May 28, 2010, presented "minimal degenerative changes of the lumbar spine with minimal disc bulges" at L4-5 and "minimal diffuse disc bulge" at L5-S1, with "minimal effacement of the right ventral aspect of the thecal sac" at both points. (AR 319.) Rivera did not see Dr. Esparza after the MRI was completed. (*See* AR 53.)

In June 2010, SSA doctors reconsidered the initial denial of DIB and SSI payments. (AR 301-02.) With respect to the allegations of depression, Charles F. Bridges, Ph.D., observed that no new mental health treatment records had been provided and affirmed the initial denial based on the evidence in the file. (AR 301.) With respect to his back pain, although Rivera submitted records of Dr. Esparza's March and April 2010 examinations, he apparently did not submit his MRI results. (*See* AR 302.) Nonetheless, John Pataki, M.D., considered the new records and the evidence in the file before affirming the initial denial as well. (*Id.*) The SSA officially affirmed the denial of DIB and SSI payments on July 1, 2010. (AR 78-80.)

Rivera began seeing Miguel Pupiales, M.D., at Pain Free New Mexico in November 2010. (AR 311.) At the initial examination, Dr. Pupiales stated that Rivera was "alert, appropriate, and oriented in all spheres," and he saw no signs of depression, agitation, or anxiety. (AR 312.) He also observed no diminished muscle strength. (AR 313.) However, he did note a mild antalgic gait and tenderness upon palpation over the lumbar segments at L4-5 and L5-S1 with sacroiliac joint tenderness. (AR 312, 313.) Dr. Pupiales also observed tenderness over the acromioclavicular joint and over the deltoid, and while Rivera had negative straight leg raise bilaterally, he experienced back pain without lower extremity radicular pain when straightening his leg. (AR 313.) Dr. Pupiales ultimately diagnosed Rivera with lumbago, an L4-5 annular tear, lumbar spondylosis, lower extremity radicular pain, right shoulder pain, and right deltoid bursitis on clinical examination. (*Id.*) Dr. Pupiales opined that Rivera "exert[ed] excellent effort on all physical examination requests, and there are no signs of symptom exaggeration, symptom magnification, or inappropriate illness behavior." (AR 312.)

Dr. Pupiales was not sure what was causing Rivera's persistent and chronic lower back pain, so he scheduled bilateral L3, L4 and L5 block injections. (AR 309-10, 313.) When those

injections provided no relief, Rivera underwent bilateral sacroiliac joint intra-articular injections on April 1, 2011. (AR 304, 306-08.) At a follow-up visit the following month, Rivera told Dr. Pupiales that he had not experienced any relief whatsoever from the injections and that he still suffered from back pain. (AR 304.) He also reported leg weakness, which Dr. Pupiales stated was not accountable via the recent lumbar MRI. (*Id.*) Dr. Pupiales continued to observe spasms over the lumbar segments, but otherwise Rivera was alert and had a normal gait. (*Id.*) Notably, a urinalysis was positive for tricyclic antidepressants as well as oxycodone. (AR 305.) At another visit in August 2011, Dr. Pupiales concluded that the lumbar intravertebral disc was the likely structural source of Rivera's pain. (AR 303.) He instructed Rivera to use a brace when lifting objects over twenty to thirty pounds, and he switched Rivera from hydrocodone to oxycodone. (*Id.*) The following month, at an exam where Rivera continued to exhibit spasms and sacroiliac joint tenderness, Dr. Pupiales mentioned that Rivera was scheduled for a caudal epidural steroid injection after insurance approval was obtained. (AR 328.)

An impairment/functional evaluation was conducted by John R. Vigil, M.D., at the request of Rivera's attorney on September 26, 2011. (*See* AR 321-22.) In addition to examining Rivera himself, Dr. Vigil reviewed records from Holy Cross Hospital and Taos Orthopedic Institute, a Dr. Robert Feldman,[2] Dr. Gelinas, and Dr. Esparza. (*Id.*) On examination, Rivera exhibited an antalgic gait, moderate tenderness of the lumbar spine in the midline with some paraspinous muscle tenderness bilaterally, and decreased range of motion to thirty degrees of flexion, but no tenderness of the sacroiliac joints. (AR 325.) Straight leg lifting was positive on

---

[2] SSA requested records from Taos Orthopedic Institute dating to November 2009 (AR 300) and from Holy Cross Hospital dating to May 2008 (AR 264). Neither institution had any record of treating Rivera after those dates. (AR 263, 300.) This is consistent with Rivera's application materials, where he claimed to have last visited these institutions in 2006 and 2007 respectively. (AR 200.) Notably, Dr. Vigil refers to an MRI conducted in 2002 at the request of a doctor at Taos Orthopedic Institute. (AR 322, 325.) No record of that MRI was provided. Finally, Rivera did not provide medical records from Dr. Feldman.

the right, with some atrophy of both thighs observed, and deep tendon reflexes were decreased on the right lower extremity. (AR 324, 325.) Dr. Vigil recorded Rivera's complaints of depression, anxiety, and insomnia but noted that Rivera's affect and mood were normal. (AR 324.) Dr. Vigil assessed Rivera with chronic back pain with radiculopathy, lumbar degenerative disc disease, and depression (AR 325), and he opined that Rivera's back pain precluded him from performing even sedentary work on a full-time and sustained basis (AR 326).

After Rivera raised his claim of depression at the ALJ's hearing, his attorney requested a psychological evaluation by Robert Krueger, Ph.D. (AR 332.) Dr. Krueger observed that Rivera's mood was "neutral to somewhat depressed" with a low energy level. (AR 334-35.) Despite Rivera's statements regarding problems with concentration and memory, a WAIS-IV test revealed generally average to high average ranges of functioning, and Dr. Krueger determined that Rivera was not suffering from a serious cognitive impairment. (AR 335-36.) However, a Beck Depression Inventory showed a highly elevated score of twenty-five, suggesting a serious problem with depression. (AR 335.) Dr. Krueger diagnosed an unspecified depressive disorder and a GAF score between forty-five and fifty.[3] (*Id.*) Based in part on Rivera's reports of chronic pain and limited movement, Dr. Krueger concluded that Rivera may have marked impairment in following instructions in a work environment, maintaining pace and persistence, adjusting to changes in work environment, and traveling to distant places alone. (AR 337.) He also expected Rivera to have moderate impairment in relationships with coworkers, supervisors, and the

---

[3] The GAF is "a hypothetical continuum of mental health-illness" assessed through consideration of psychological, social, and occupational functioning. Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders: DSM-IV-TR* 34 (4th ed., text rev. 2005). A score between forty-one and fifty is assessed when the patient is believed to have "[s]erious symptoms . . . OR any serious impairment in social, occupational, or school functioning." *Id.*

general public and with being aware of and reacting appropriately to dangers in work environments. (*Id.*)

**HEARING TESTIMONY**

On October 4, 2011, the ALJ held a hearing at which both Rivera and a vocational expert ("VE") testified via video. (AR 18.) Rivera testified that he is only able to drive twice a week for short distances (AR 42), that Dr. Esparza prescribed the use of a cane when walking (AR 49, 53), and that Dr. Pupiales prescribed the use of a back brace as well (AR 58). He also stated that he can only sit, stand, or walk for ten minutes before he feels pain, that he can only pick up a half-gallon of milk as long as he does not have to bend over to do so, and that he cannot pick up a gallon of milk at all. (AR 55-56.) In addition to taking doxepin to get to sleep, Klonopin to stay asleep, and tramadol for pain, Rivera said that he takes hydrocodone four times a day and that it causes him to feel dizzy and drunk. (AR 49-50, 52.) He also testified that he takes no medication for his depression, though he was prescribed an unspecified antidepressant at one point. (AR 54.)

The ALJ and Rivera's attorney next questioned the VE, Cornelius J. Ford, regarding Rivera's past work history and his future work ability. (AR 59-70.) After reviewing Rivera's past work, the ALJ first asked the VE if a hypothetical person of Rivera's age, education, and work experience could perform any work if he were subject to the following limitations: lifting and carrying twenty pounds occasionally and ten pounds frequently; pushing and pulling a corresponding amount; sitting for six of eight hours; standing and walking for two of eight hours; occasionally balancing, stopping, crouching, kneeling, crawling, and climbing stairs and ramps; never climbing ladders, ropes, or scaffolds; and avoiding unprotected heights, slippery or uneven surfaces, and concentrated exposure to extreme cold. (AR 61-62.) The VE testified that such a person could not perform Rivera's past work, but he also said that this person could perform

other jobs such as teacher aide, money counter, or security surveillance system monitor. (AR 62-63.) Since the first two examples require a light exertional level, the ALJ then asked what the impact would be of dropping such a hypothetical person to a "straight sedentary RFC," limiting him to occasionally lifting or carrying no more than ten pounds, pushing and pulling commensurate with lifting and carrying abilities, sitting six out of eight hours, standing and walking two out of eight hours, but otherwise remaining the same as the first hypothetical. (AR 63-64.) In that case, the VE testified that this person could perform jobs such as security surveillance system monitor, switch board operator, phone information clerk, and lens inserter, all of which only require a sedentary exertional level. (AR 64-65.)

### THE ALJ AND APPEALS COUNCIL'S DECISIONS

The ALJ reviewed Rivera's claim pursuant to the five-step sequential evaluation process. (AR 19-20.) She first determined that Rivera had not engaged in substantial gainful activity since his onset date. (AR 20.) She then found at step two that Rivera suffered from one severe impairment, degenerative disc disease of the lumbar spine. (*Id.*)

Continuing with her step-two analysis, the ALJ also found that Rivera's depression did not cause more than minimal limitations and was therefore non-severe. (*Id.*) In reaching this finding, the ALJ reviewed Dr. Krueger's assessment, but she did not find it credible and accorded it "little weight" for four reasons: (1) his single evaluation of Rivera "was performed *after* the hearing, at which time Mr. Rivera had every reason to exaggerate his conditions" and "present himself in the worst possible light"; (2) the evaluation was performed at the request of Rivera's attorney; (3) other than "one indication" that Rivera had taken antidepressants, the record did not otherwise show any psychological symptoms or treatment; and (4) Rivera's activities of daily living described in his function report did not suggest a severe mental

12

impairment in light of the preceding factors. (AR 21.) On the other hand, the ALJ also gave "little weight" to the findings of the agency psychological consultants, Dr. Chiang and Dr. Bridges, that Rivera suffered no medically determinable mental impairment at all, as these were completed before Dr. Krueger's evaluation. (*Id.*)

The ALJ went on to consider the "paragraph B" criteria described in Section 12.00(C) of the impairments listed in Appendix 1 of the SSA's regulations. (*Id.*; *see also* 20 C.F.R. pt. 404, subpt. P, app'x 1, § 12.00(C).)[4] In doing so, the ALJ focused primarily on Rivera's function report and the description of his daily activities and abilities therein. (AR 21; *see* AR 212-19.) The ALJ found that Rivera had no limitations with respect to daily living or social functioning; only mild limitations with respect to concentration, persistence, and pace; and no extended episodes of decompensation. (AR 21.) As these findings were not consistent with more than mild limitations in mental functioning, the ALJ determined that Rivera only possessed a non-severe depressive disorder. (*Id.*)

Moving to step three, the ALJ concluded that Rivera's degenerative disc disease, alone or in combination with other impairments, did not meet or medically equal an impairment or combination of impairments listed in Appendix 1. (AR 22.) Specifically, the ALJ determined that Rivera's degenerative disc disease did not fall under Listing 1.04, Disorders of the Spine, as "there is no evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss accompanied by sensory or reflex loss and

---

[4] Although Appendix 1 listings are typically used at step three to determine whether a claimant's medically severe impairments meet or medically equal an impairment found there, "the 'paragraph B' criteria help the ALJ determine at step 2 whether the claimant has severe mental limitations that require further consideration in the evaluative sequence." *Cress v. Colvin*, No. 12-CV-86-FHM, 2013 WL 2240059, at *2 (N.D. Okla. May 21, 2013) (unpublished).

positive straight-leg raising test. Additionally, the record does not reflect spinal arachnoiditis or lumbar spinal stenosis." (*Id.*)

The ALJ proceeded to evaluate Rivera's RFC. (AR 18.) In doing so, she expressly cited to the records of Rivera's treatment by Dr. Gelinas, Dr. Esparza, and Dr. Pupiales. (AR 23-24.) While the ALJ also referred to the impairment/functional evaluation performed by Dr. Vigil (AR 24-25), she noted that his assessment "appears to be based on a one-time examination performed at the request of counsel," that Dr. Vigil was not provided with Rivera's 2010 MRI records, and that some of the records that he relied upon were not themselves part of the record (AR 25-26). Accordingly, the ALJ accorded Dr. Vigil's opinion "little weight." (AR 25.) She also accorded "some weight" to agency medical consultants Dr. Werner and Dr. Pataki, and she referred to her earlier weighting of the opinions of Dr. Krueger and the state psychological consultants. (AR 26.) Additionally, while acknowledging the function report completed by Rivera's wife, the ALJ did not fully credit her statements. (*Id.*)

Based on her findings, the ALJ determined that Rivera possessed an RFC to perform sedentary work, with the following additional restrictions: occasional lifting and carrying of ten pounds; pushing and pulling commensurate with the ability to lift and carry; ability to sit for six hours in an eight-hour workday; ability to stand and walk for six hours in an eight-hour workday; occasional stair or ramp climbing, balancing, stooping, crouching, kneeling, and crawling; no climbing of ladders, ropes, or scaffolds; and avoiding unprotected heights, slippery or uneven surfaces, and concentrated exposure to extreme cold. (AR 22, 26.) The ALJ also found that Rivera's statements as to the intensity, persistence, and limiting effects of his symptoms were not credible to the extent that they were inconsistent with this RFC. (AR 23.)

14

Relying on this RFC, the ALJ concluded that while Rivera could not perform any of his past relevant work, he was able to perform other jobs that exist in significant numbers in the national economy. (AR 26-27.) On that basis, the ALJ determined that Rivera was not disabled under the meaning of the Social Security Act and not entitled to benefits. (AR 27-28.) Rivera appealed the decision to the Appeals Council (AR 12-14), but the Council found that Rivera's reasons for disagreeing with the hearing outcome did not justify a review of the ALJ's decision, thereby rendering the ALJ's decision the final decision of the Commissioner (AR 1-3).

**DISCUSSION**

Rivera raises multiple challenges to the ALJ's decision to deny DIB and SSI payments, which I reorganize so as to follow the five-step sequential evaluation process. First, Rivera argues that the ALJ erred in finding that his depression does not constitute a severe impairment. (Doc. 21 at 9-13.) Second, he contends that the ALJ erred at step three by finding "no evidence" that his back condition meets or medically equals an impairment listed in the Appendix of SSA regulations. (*Id.* at 5-9.) He also raises other alleged errors regarding the ALJ's weighting of the medical evidence, her consideration of his depression at steps four and five, her evaluation of the credibility of Rivera's wife, and her purported failure to incorporate Rivera's use of a cane in her RFC analysis. (*Id.* at 13-14, 15-17.) Finally, Rivera broadly contends that the ALJ's discussion at steps four and five was not supported by substantial evidence. (*Id.* at 14-15, 17-18.) Because I find that the ALJ committed reversible error at step three, I do not address Rivera's additional claims of error beyond that step.

## I.     Depression at Step Two

Rivera claims that the ALJ's failure to recognize his depression as severe at the second step of the sequential evaluation process was not supported by the record. (Doc. 21 at 9-13.)

Generally speaking, step two is a threshold step that is simply meant to "weed out at an early stage of the administrative process those individuals who cannot possibly meet the statutory definition of disability." *Dray v. Astrue*, 353 F. App'x 147, 149 (10th Cir. 2009) (unpublished) (quoting *Bowen v. Yuckert*, 482 U.S. 137, 156 (1987) (O'Connor, J., concurring)). At this step, all the ALJ is required to do is determine whether the claimant suffers from one or more severe impairments in order to ensure that review proceeds to the next step. *See Oldham v. Astrue*, 509 F.3d 1254, 1256 (10th Cir. 2007); 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii) (ending the analysis only "[i]f you do not have a severe medically determinable physical or mental impairment . . . or a combination of impairments that is severe"); *see also Dray*, 353 F. App'x at 149 ("[T]he failure to find a particular impairment severe at step two is not reversible error as long as the ALJ finds that at least one other impairment is severe."); 20 C.F.R. §§ 404.1523, 416.923 (noting that when determining the medical severity of multiple alleged impairments at step two, the SSA considers the effects of the impairments "without regard to whether any such impairment, if considered separately, would be of sufficient severity").

Although the ALJ did not find Rivera's depression to be severe, he did find at step two that Rivera's degenerative disc disease constitutes a severe impairment, then proceeded to step three. (AR 20, 22.) Because that is all he was required to do here, any error at this step with respect to Rivera's depression was harmless. *See Dray*, 353 F. App'x at 149 (citing *Oldham*, 509 F.3d at 1256). Therefore, the ALJ did not err in failing to find Rivera's depression to be severe at step two.

## II.   Back Condition at Step Three

At step three, the ALJ concluded that Rivera's degenerative disc disease does not meet or medically equal Listing 1.04, "[d]isorders of the spine," finding "no evidence of nerve root

compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss accompanied by sensory or reflex loss[,] and positive straight-leg raising test." (AR 22 (citing 20 C.F.R. pt. 404, subpt. P, app'x 1, § 1.04(A)).)[5] Rivera argues that the ALJ's decision does not show that she sufficiently considered the evidence for and against this conclusion and that the finding of "no evidence" of these symptoms was incorrect and unsupported by the record. (Doc. 21 at 5-6.)

An ALJ may not simply state a "summary conclusion" that a claimant's impairments do not meet or equal any listed impairment; instead, she must "discuss the evidence [and] [her] reasons for determining that [claimant] [i]s not disabled at step three." *Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996); *see also id.* at 1010 ("[I]n addition to discussing the evidence supporting his decision, the ALJ also must discuss the uncontroverted evidence [s]he chooses not to rely upon, as well as significantly probative evidence [s]he rejects."). Still, even if an ALJ fails to make specific step-three findings, a court may affirm her decision when "confirmed or unchallenged findings made elsewhere in the ALJ's decision confirm the step three determination under review." *Fischer-Ross v. Barnhart*, 431 F.3d 729, 734 (10th Cir. 2005). In other words, if an ALJ's review of the evidence at steps four and five would "conclusively preclude Claimant's qualification under the listings at step three" such that "[n]o reasonable factfinder could conclude otherwise," the ALJ's failure to discuss her step-three findings in detail will constitute harmless error and will not serve as a basis for remand. *See id.* at 735.

In *Fischer-Ross*, the claimant alleged that he suffered from several disabling impairments, including lumbar spondylitis. *See id.* at 734-35. Although the ALJ only stated in a

---

[5] Although Listing 1.04 may also be met if the claimant suffers from spinal arachnoiditis or lumbar spinal stenosis, *see* 20 C.F.R. pt. 404, subpt. P, app'x 1, § 1.04(B) & (C), Rivera does not challenge the ALJ's failure to find evidence of these conditions.

summary fashion that the claimant's conditions did not meet or equal a listed impairment, *see id.* at 731-32, the ALJ then conducted a thorough and detailed RFC analysis before determining that the claimant was sufficiently able to sit, stand and walk to perform even "medium work," to lift at the "light" level, and to stoop, crawl, crouch, and kneel occasionally, *see id.* at 735. The Tenth Circuit held that these findings "conclusively negate[d] the possibility of any finding that Claimant is presumptively disabled" under Listing 1.04. *See id.* As such, the Tenth Circuit found the ALJ's failure to include a detailed step-three analysis was harmless error and affirmed his decision. *See id.*

The Tenth Circuit's unpublished but persuasive opinion in *Henderson v. Astrue* provides a useful contrast. *See* 383 F. App'x 700 (10th Cir. 2000) (unpublished). There, as in *Fisher-Ross*, the claimant alleged a disabling back impairment, and the ALJ summarily determined at step three that this impairment did not meet or medically equal a listed impairment. *See id.* at 702. However, the ALJ's subsequent RFC analysis was replete with evidence suggesting that the claimant's condition met or equaled Listing 1.04, including an MRI showing small to moderate disc protrusions, a diagnosis of arachnoiditis, and evidence that the claimant's back problems required frequent postural adjustments. *See id.* The ALJ also failed to find, and the medical evidence failed to conclusively establish, that the claimant's problems were resolved by treatment or that the problems did not lead to other symptoms set forth in Listing 1.04. *See id.* Accordingly, the Tenth Circuit remanded the case, concluding that there was "certainly sufficient evidence in the record to create a question as to whether [the claimant] met the medical requirement for Listing 1.04(B), and there [were] no findings by the ALJ, like those in *Fischer-Ross*, that conclusively negate that possibility." *Id.*

In this case, the Commissioner argues that the evidence in the record supports the ALJ's finding of "no evidence" that Rivera's back condition meets Listing 1.04. (Doc. 24 at 5.) She points to Dr. Gelinas's report of a negative straight leg test, no motor weakness, and no atrophy or edema, and she cites Dr. Gelinas's conclusion that Rivera's condition did not warrant a fusion procedure. (*See id.* at 5-6.) She also refers to the record of Rivera's June 2009 examination by Dr. Esparza, which described a negative straight leg test, no ambulation problems, no spasms, good motor strength, and Rivera's own claim of eighty-percent relief from his right L4-5 facet injection at that examination. (*See id.* at 6.) Additionally, the Commissioner cites Dr. Pupiales's reports that Rivera possessed a normal gait and stance as well as Dr. Werner's conclusion that Rivera's condition did not meet or equal a listed impairment or preclude him from light work activity. (*See id.*) Finally, the Commissioner recites Rivera's own statements regarding his daily activities in his disability forms, arguing that these support the ALJ's "no evidence" finding. (*See id.*)

However, as Rivera notes, there is significant evidence that runs contrary to the Commissioner's arguments and the ALJ's decision. With respect to the first requirement of Listing 1.04(A), nerve root compression characterized by neuro-anatomic distribution of pain, Dr. Gelinas determined that Rivera suffered from severe degenerative disc disease and right-sided disc herniation at L4-5 and L5-S1 (AR 252-53), Dr. Pupiales diagnosed Rivera with lower extremity radicular pain (AR 313), and Dr. Vigil examined Rivera before assessing him with radiculopathy and lumbar degenerative disc disease (AR 325). Additionally, Dr. Gelinas, Dr. Esparza, and Dr. Pupiales all diagnosed Rivera with spasms over the lumbar and gluteal regions (*see* AR 252, 258, 289, 291, 304, 328), and reports of tenderness in Rivera's lumbar and sacroiliac regions were frequent (*see* 252, 258, 260, 328). Next, Dr. Gelinas and Dr. Vigil both

19

concluded that Rivera's range of motion with respect to his back was decreased to thirty degrees of flexion. (AR 252, 325.) With respect to motor loss accompanied by sensory or reflex loss, while Dr. Esparza observed no ambulation problems in June 2009 (AR 260), he repeatedly noted during other examinations that Rivera possessed an antalgic gait (AR 258, 291), a diagnosis that Dr. Pupiales and Dr. Vigil echoed (AR 312, 325). Dr. Vigil also observed atrophy of both thighs and decreased deep tendon reflexes on the right lower extremity (AR 325), and Dr. Esparza often noted decreased sensation over the L4 dermatome (AR 258, 260, 289, 291). Finally, even though Dr. Esparza and Dr. Vigil observed negative straight leg raise more frequently (AR 252, 260, 289, 313), both physicians recorded positive straight leg raise on the right at one point (AR 258, 325).

This record is not negated by Rivera's record of treatment or by the weighting of the evidence. Though the ALJ's accorded "little weight" to Dr. Vigil's opinion (AR 25), the ALJ may not ignore Dr. Vigil's clinical findings altogether when making a step-three determination. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c) ("When we determine if your impairment medically equals a listing, we consider all evidence in your case record about your impairment(s) and its effects on you that is relevant to this finding."). Additionally, although the Commissioner argues that Rivera's condition is amenable to treatment and therefore non-disabling, pointing to the "80% relief" provided by a facet injection on one occasion (Doc. 24 at 6), the ALJ never made a finding as to whether Rivera's condition was amenable to treatment, and the record does not conclusively resolve the question either way. *See Henderson*, 383 F. App'x at 702; *see also Allen v. Barnhart*, 357 F.3d 1140, 1145 (10th Cir. 2004) (noting "the general rule against post hoc justification of administrative action").

20

Given the record before me, the ALJ's conclusion that Rivera showed "no evidence" of nerve compression with neuro-anatomic pain distribution, limitation of spinal motion, motor loss, and positive straight leg raising is plainly inaccurate. More importantly, Rivera's case is analogous to *Henderson* in that there is "certainly sufficient evidence in the record to create a question as to whether [he] met the medical criteria" for Listing 1.04. *See* 383 F. App'x at 702. Further, "there are no findings by the ALJ . . . that conclusively negate that possibility." *See id.* (citing *Fischer-Ross*, 431 F.3d at 735). Because I cannot "confidently say that no reasonable administrative factfinder, following the correct analysis, could have resolved the factual matter in any other way" than the ALJ did, *see id.* (quoting *Fischer-Ross*, 431 F.3d at 733-34) (internal quotation marks omitted), I find that the ALJ committed reversible error at step three by failing to apply the correct legal standards. Because this error requires remand, I do not reach Rivera's remaining arguments.

## CONCLUSION

The ALJ erred in her review of Rivera's applications for DIB and SSI payments. While any error in her step-two analysis was harmless, the ALJ's summary step-three conclusion was insufficient, and her RFC analysis did not "conclusively negate the possibility of any finding that [Rivera] is presumptively disabled under the pertinent listing." *See Fischer-Ross*, 431 F.3d at 735 (citation omitted). As such, I grant Rivera's motion to reverse, and I remand this case back to the SSA for proceedings consistent with this opinion.

IT IS SO ORDERED.

_____
William P. Lynch
United States Magistrate Judge

A true copy of this order was served
on the date of entry--via mail or electronic
means--to counsel of record and any pro se
party as they are shown on the Court's docket.